UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

JAMES ROSE,                          )
                                     )
        Plaintiff,                   )
                                     )          No. 5:17-CV-378-REW
v.                                   )
                                     )
UNITED PARCEL SERVICE, INC.,         )          OPINION AND ORDER
                                     )
        Defendant.                   )

*** *** *** ***

Defendant UPS moves for summary judgment on Plaintiff Rose's sole claim in this

employment discrimination action under the Kentucky Civil Rights Act.[1] DE #24. There are no

genuinely disputed material facts underlying the determinant legal issues in this controversy, and

Plaintiff has failed to provide evidence sufficient to establish all elements of his prima facie case.

Likewise, there is no triable pretext theory. Thus, the Court grants Defendant's Motion for

Summary Judgment.

### A. Factual and Procedural Background

Plaintiff James Rose began as a seasonal feeder driver for United Parcel Service, Inc.

("UPS") in October 2010, based in Lexington, Kentucky, and eventually he progressed to a full-

time position driving with the company. DE #24-2 (Rose Depo.) at 4.[2] As a full-time feeder driver,

Rose's direct supervisor was Mike Mattingly, and UPS paid Rose hourly wages plus roughly $0.87

per mile. DE #37 (Mattingly Depo.) at 16; DE #24-2 at 3. Rose's role as a feeder driver required

---

[1] Despite the many parallels to the Americans with Disabilities Act (as discussed throughout), this
matter is before the Court on diversity jurisdiction, with the KCRA supplying the decisional basis.
[2] All citations to deposition transcripts refer to the CM/ECF pagination. The Court's summary
adopts Rose's version and gives him all fair inferences.

him to transport shipments via tractor-trailer between cities by delivering containers to specific destinations, called turnaround points (often a truck stop or rest area, *see* DE #24-23 (Mattingly Aff.) at ¶ 6) and exchanging them with other drivers' freights for a return haul (these drivers were referred to as "meet men"). DE #24-2 at 42. This exchange is not always simple for UPS drivers, with many trucks and individuals crowding the stops, making it sometimes difficult to find the correct meet man and accompanying trailer. *Id.* at 42–43. At times, this would not be a face-to-face meeting, and drivers would simply pick up the trailers their meet man had left, once located. DE #24-23 at ¶ 6. Drivers must complete this round-trip process within fourteen hours in order to comply with Department of Transportation (DOT) regulations. DE #24-2 at 40. After the fourteenth on-duty hour, drivers may no longer complete driving activities, although they may work in other capacities for the company. *Id.* at 41; DE #24-23 at ¶ 11. In each driver's truck there are digital apps or devices—a GPS unit, an IVIS system, and a Telematix application[3]—which track and communicate the driver's timing and whereabouts back to UPS; the drivers need only indicate on their in-truck computers that they are stopping, taking a break, etc., and the system records the activity, time, and location. DE #37 (Mattingly Depo.) at 51–52; DE #24-2 (Rose Depo.) at 25–26. These mechanisms are used to calculate each driver's hourly and per-mile pay, which appears on a computer-generated timecard. *See* DE #24-8 (Rose's June 27, 2016 timecard).

   1.  **The June 27, 2016 Beckley Run**

   While at UPS, Rose frequently completed interstate trips, including some to Greensboro, North Carolina and at least two Beckley, West Virginia, despite those not being his regular routes;

---

[3] The Telematix program works with IVIS to communicate a near-real-time record of each driver's activities to UPS management. DE #37 at 52–54. On the date of Rose's termination, it is undisputed that the Telematix function in Rose's model truck was not working properly or communicating with UPS. *Id.* at 55.

at times, such routes could prove treacherous, due to weather and other driving conditions, and route timing was not always completely predictable. *See* DE #37 (Mattingly Depo.) at 64; DE #34-1 (Rose Aff.) at ¶ 6. Rose made one such drive to Beckley on June 27, 2016, preceding Fourth of July weekend and following a week of heavy flooding in the area. DE #34-1 at ¶ 6. Rose began work early in the morning on June 27, clocking in at UPS at 12:44 a.m.[4] DE #24-2 at 83. In the tractor line that morning as Rose prepared his truck, he engaged in conversation with a fellow driver (and union steward), Gary Kendrick, expressing that he was experiencing sinus issues and had "been having problems using the restroom and stuff." *Id.* at 72–73. Kendrick responded that Rose "better get it checked out . . . It could be something with your prostate." Rose stated that he planned to do so a couple of days later, but the conversation ended there. *Id.* at 73. At roughly 1:51 a.m., after setting up and inspecting his vehicle and trailer, Rose left UPS and began the drive to Beckley. *Id.* at 84. After a quick stop at a gas station to purchase coffee and nasal spray, Rose continued to Beckley, arriving at the turnaround point at 7:50 a.m. *Id.* at 84–85. At the Beckley turnaround, Rose briefly and casually spoke with a driver supervisor named Robert Williams about his urination experience that day. *Id.* at 74 ("I said, Robert, I don't know what's going on. I said, I've been pissing all day."). After this comment, the conversation shifted to purchasing assault rifles, before ending when Rose left to use the restroom. *Id.* at 75. At 10:04 a.m., Rose left the Beckley turnaround to return to Lexington. *Id.* at 86.

Excluding allotted meal and break time, his timecard indicates that Rose spent seventy-seven minutes of paid, but undetailed, time at the Beckley turnaround point. DE #41-1 (Rose

---

[4] The times discussed in Rose's deposition reflect the times appearing on his timecard from the June 27 Beckley run. *See* DE #24-8.

Depo.) at 42.[5] At the turnaround, it should have taken Rose a certain amount of time to drop his trailer and then identify and pick up his return load. This period also required some inspection duties. Mattingly estimated the period as typically taking 30-45 minutes. *See* DE #24-23 (Mattingly Aff.) at ¶ 9. Rose had recently, just days before, spent but ten minutes working at the Beckley turnaround. *See id.* at 3 n.1. He argues here that some of the 77 minutes was properly work, but some was spent attending to bathroom needs.[6] Notably, Rose also spent 57 minutes of break and lunch time while at Beckley. *See* DE #24-2 (Rose Depo.) at 106; DE #24-23 at ¶ 15.

Rose argues much of this unallotted time, as during all other longer-than-usual stops on June 27, was spent in the restroom as a result of his difficulty urinating. *Id.* at 33 ("I told you it took me longer to use the restroom all that day."). As Rose neared Lexington on his return trip that afternoon, at 2:32 p.m., he received a call from a UPS payroll supervisor at the Lexington hub, Chris Allen, asking Rose where he was and expressing concern that Rose was about to violate the DOT fourteen-hour rule. DE #24-2 (Rose Depo.) at 149–150; DE #37 (Mattingly Depo.) at 37–38. Without mentioning any of his claimed physical ailments throughout the day, Rose assured Allen that he would arrive within the fourteen-hour window, and the conversation ended. DE #24-2 at 150. When Rose arrived back at the hub, at 2:45 p.m., he pushed the applicable button in his truck to indicate arrival, but the computer delivered an auto-fail message, and Rose called from the guard shack at the hub's entrance, instead, to notify management that he had returned to the

---

[5] Rose's deposition, although completed in one continuous session, appears in the record in two places—DE #24-2, as an attachment to UPS's summary judgment motion, and DE #41-1, as an attachment to UPS's reply. Neither transcript is complete (as each omits pages throughout), and the versions are not identical (as they omit different pages), but many parts of the two documents are the same. The Court utilized and references both versions, referring to both as the "Rose Depo."

[6] Mattingly testified that Rose did not mention any difficulty completing his June 27 Beckley turnaround duties or delays that would have extended the typical turnaround completion time. *See* DE #37 at 163.

hub. *Id.* at 76, 116–17. Rose spoke with a dispatch supervisor, who simply told him to break his set-up (*i.e.*, separate and drop off his trailers) to complete his duties for the trip. *Id.* at 76, 150.

## 2. Rose's Termination

After Rose completed his duties—and after using a portable toilet onsite—he approached the UPS building; Mattingly was waiting for him at the door. *Id.* at 76. At this time, Rose asserts that he was "dehydrated and things were kind of foggy" as a result of frequent urination throughout the day. *Id.* Mattingly and Rose then had the following exchange: "He asked me 'how was everything today[?]' I said it was all right. He said, 'How was traffic? Did you run into any problems?' I said, 'No, traffic was all right.' There was something else he said. I can't really recall what he said. . . I mean, I opened the door and he just hit me like a ton of bricks. So I'm dazed." *Id.* at 76–77. After this conversation, Mattingly told Rose to clock out and meet Mattingly in his office; Rose did so and found Mattingly and Gil Daniel, a union representative, waiting to speak with him. *Id.* at 77; *see also* DE #24-23 (Mattingly Aff.) at ¶ 19.

Mattingly proceeded to ask Rose specific questions about his timecard and whereabouts during the day, which Rose had trouble answering in detail.[7] DE #24-2 (Rose Depo.) at 77. Mattingly revealed that he believed Rose had been "stealing time," *i.e.*, taking improper breaks while on the clock during his shift that day; in response, however, Rose could not recall precisely how long his restroom stops lasted. *Id.* ("I said, 'What's this about?' 'Well, this is about you stealing time.' I said, 'Mike, I didn't steal nothing.' He's like, 'This is about you being dishonest.'

---

[7] Rose provides a written statement from Gil Daniel to corroborate his claim of obvious disorientation during the termination meeting. DE #30-15 (Exhibit 25 to Mattingly Depo.). However, this statement is unsworn and inappropriate for the Court to consider at trial, and thus, at summary judgment. *See Worthy v. Mich. Bell Telephone Co.*, 472 F. App'x 341, 343–344 (quoting *Harris v. J.B. Robinson Jewelers*, 627 F.3d 235, 239 n. 1 (6th Cir. 2010)) ("[A] court may not consider unsworn statements when ruling on a motion for summary judgment." (citation omitted)).

. . . Then he prints off the timecard. He's like, 'Can you tell me about this?' Then I went through my day, what I did, step by step, everywhere I stopped at. But I did not know the times on how long it took me to use the restroom."); *see also* DE #37 (Mattingly Depo.) at 57 ("When he was asked how many times did he stop—'I don't know.' 'Where did you stop?' 'I'm not sure.' He was very vague and evasive in his answering. 'What did you do?' 'I used the restroom.' 'What else?' 'I don't know.' 'Why did it take you so long at the turnaround location?' 'I don't know.'"); *see id.* at 109 ("I went through the time card with Mr. Rose line by line . . . Mr. Rose had an opportunity [to explain].").

Finally, Rose for the first time told Mattingly: "[I]t took me that long because I believe that I have either a kidney infection or a urinary tract infection, or it could be my prostate. . . And I had—I needed to see a doctor." *Id.* at 77–78. Even after seeking clarification from Daniel, Rose stated he felt unable to properly address and answer Mattingly's many questions about his day. Mattingly pressed, "Is it right to steal? *Id.* And Rose responded, "No. No, it's not right to steal." *Id.* After Mattingly's conversation with Rose concluded, and with Rose still in his office, Mattingly called UPS labor relations manager Matt Faulstick. DE #37 (Mattingly Depo.) at 128. During that phone call, Mattingly discussed with Faulstick his impression that Rose had submitted an inaccurate timecard for that day, and Faulstick ultimately decided that discharge was appropriate. *Id.* ("I made a phone call to Mr. Faulstick and the determination was made to terminate."); DE #40 (Faulstick Depo.) at 24 ("The initial conversation [with Mattingly] was that there were multiple gaps in the day in unaccounted-for time, and Mr. Rose did not have an explanation to account for the gaps in the day and account for time."); *id.* at 22 ("I reviewed the information that was provided to me from the company [via Mattingly] and I made the decision."). Rose then "was discharged and walked to the gate," meaning, "[h]is employment was terminated[,]" for all practical purposes,

at that point. DE #37 (Mattingly Depo.) at 126–27. Rose's official termination letter followed the next day, indicating that Rose's discharge was based on "dishonesty" and "other cardinal offenses."[8] DE #24-12 (Termination Letter). Although there was some initial confusion as to what the "other cardinal offenses" were,[9] Mattingly clarified in his deposition that it referred to his "fail[ure] to follow instructions on recording his time accurately[]" and keeping management informed about his whereabouts. DE #37 (Mattingly Depo.) at 154–55.

The Court has carefully explored the UPS time rules. The conclusion, on this record, is that UPS does allow short bathroom breaks on the clock to a reasonable extent. Thus, Rose claims his training was to clock out only for a break exceeding 9-10 minutes. *See* DE #34-1 (Rose Aff.) at ¶ 3. The UPS-Union negotiations seemed to land at that rule as well. *See* DE #37 (Mattingly Depo.) at 104–05 (Mattingly noting that the UPS-Union joint resolution provided that "employees . . . do not have to code out bathroom breaks, but [may] not abuse this issue"). Further, there is no rule against clocking out to take a longer bathroom break as needed. The key here is that Rose had over two hours of non-work time recorded as work time on his timesheet for the day. *Id.* at 108 ("Mr.

---

[8] UPS, as part of its agreement with the union, had a policy of progressive discipline (warning letter, suspension, then discharge) for lower-level offenses, but for dishonesty, and other "cardinal offenses," the company could proceed directly to termination. DE #40 (Faulstick Depo.) at 40–41.
[9] Although UPS took the position during the grievance process (discussed later in the Opinion) that Rose *actually* violated the DOT fourteen-hour rule, constituting another cardinal offense, the discipline form accompanying Rose's termination letter stated only that "[h]e nearly violated DOT 14 hour rule with less than a minute to spare and never notified management to seek an extension if needed." DE #30-11 at 5. Mattingly confirmed in his deposition that any subsequently alleged violation in Rose's grievance process was not a basis for termination at the time Mattingly initially communicated to Faulstick about discharge. DE #37 at 79–80, 154–55. *Cf.* DE #40 (Faulstick Depo.) at 35–36 (stating that violation of the DOT fourteen-hour rule was one of the "cardinal offenses" on which Rose's termination was based). This statement is somewhat inconsistent with other statements Faulstick made surrounding the termination conversation; he admits that his initial termination decision rested "solely" on Mattingly's representations to him (*id.* at 22), and Mattingly denies knowledge of any actual DOT violation at the time Rose was discharged on June 27. DE #37 at 154–55. The fourteen-hour rule conclusive details emerged during the grievance process.

Rose had over two hours of unaccounted for time. That is a gross abuse and is a dishonest action on his part."). Without question, UPS, like any employer, is entitled to require and expect honest timekeeping by its employees.

### 3. Medical Documentation and Grievance Process

Although not directly involved in UPS's initial decision to terminate Rose (which is the relevant point in time for the present KCRA analysis), additional facts unearthed in the grievance process, and some subsequently revealed by Rose in his deposition, give context to the dispute. Rose testified that the day after his termination—June 28, 2016[10]—he went to an APRN, who provided a note stating that Rose could return to work without restriction on July 6, 2016; Rose claims the note did not accurately reflect the purpose of his visit. DE #24-2 (Rose Depo.) at 129 ("[T]hat document seems to be useless on what I need[ed]."); DE #24-14 at 2. Rose also provided medical documentation from his family physician, dated July 25, 2016,[11] stating that Rose previously "had [a] medical issue requiring bathroom time, is being treated and issue is resolved." DE #24-14 at 3. Rose testified that this note accurately reflected the state of his condition at the time of his deposition. DE #24-2 at 130. Lastly, Rose provides a note from Dr. Angel Justice[12] dated July 1, 2016, which states: "While out with Mr. Rose and some of our friends on 6/25/16

---

[10] The date on the documentation is inconsistent with the date Rose seems to believe this visit occurred, based on his testimony. *Compare* DE #24-2 at 129 *with* DE #24-14 at 2.

[11] The date on this documentation is also inconsistent with the date Rose seems to believe this visit occurred, based on his testimony. *Compare* DE #24-2 at 129–30 *with* DE #24-14 at 3. Rose's date recall is sketchy at best in this context.

[12] Notably, Dr. Justice's opinion was not based on any physical or medical examination or testing, but, rather, solely on Rose's brief self-described statements in a social setting: "I was going to the restroom and it had been taking me a while there. So I started having some pain towards my back. So her being a doctor and me being a cheapskate—so I went over there and I asked her—I said, I'm having problems right through here, and it's taking me a little bit longer. And she said, you know, from what I told her, she said, it sounds like you're either having a urinary tract infection, a UTI, a kidney infection, or something going on with your prostate. You need to go follow up with your doctor your family doctor." DE #24-2 at 80.

[two days prior to the termination] he complained of left back pain, frequent urination, urinating hesitantly, and some dribbling . . . I told him possible causes could be a UTI, kidney stones, prostate problems, [or] kidney infection . . . and told him he should ask his family doctor to do a complete examination." DE #24-14 at 1. Rose provided no documentation to UPS prior to the discharge. Indeed, per the records, none would have existed at that point; Rose had not, at least in the records before the Court, been formally treated in any way, prior to termination, for the claimed focal issue.

On July 1, 2016, Rose filed a grievance through his union representative. *See* DE #24-13 at 4 (Grievance Form). On July 7, Rose, Mattingly, Faulstick and other relevant players attended a local-level grievance hearing, where Rose presented the above medical documentation. DE #40 (Faulstick Depo.) at 64–65. After UPS denied Rose's claim at this hearing, *see* DE #24-17 at 2 (Grievance Committee Decision), the union advanced the matter to the Kentucky State Grievance Panel, and Rose was granted a hearing for July 26, 2016, *see* DE #24-15 (Grievance Letter). However, the hearing was continued until August 23; in the interim, UPS offered Rose a "Return to Work Agreement," which would reduce his discharge to a suspension, but note that this was his "Last and Final Warning" prior to termination, if another offense were to occur. DE #24-16 (Agreement). Rose refused to sign the agreement and proceeded to the panel hearing. There, Rose challenged his termination, arguing that "he was ill and admitted he had taken excessive time because of his illness." DE #24-15 at 2. When the panel also denied Rose's claim, the union appealed on his behalf. DE #24-18 (Appeal Letter). However, this appeal was unsuccessful. DE #24-19 at 1 (Letter re: Appeal Decision).

Without further union recourse, Rose commenced this action in the Fayette Circuit Court, and UPS removed the case to this Court. DE #1 (Notice of Removal). Rose alleges disability

discrimination under the Kentucky Civil Rights Act, seeking damages. DE #17-1 (Complaint). UPS has moved for summary judgment on the Complaint's sole count. DE #24. Rose responded in opposition (DE #34), and UPS replied (DE #41). The matter is ripe for consideration.

### B. Discussion

#### 1. Summary Judgment Standard

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must construe the evidence and draw all reasonable inferences from the underlying facts in favor of the nonmovant. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 106 S. Ct. 1348, 1356 (1986); *Lindsay v. Yates*, 578 F.3d 407, 414 (6th Cir. 2009). Courts may not "weigh the evidence and determine the truth of the matter" at the summary judgment stage. *Anderson v. Liberty Lobby, Inc.*, 106 S. Ct. 2505, 2511 (1986). "The relevant inquiry is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Little Caesar Enters., Inc. v. OPPCO, LLC*, 219 F.3d 547, 551 (6th Cir. 2000) (quoting *Anderson*, 106 S. Ct. at 2512).

The burden of establishing the absence of a genuine dispute of material fact initially rests with the moving party. *Celotex Corp. v. Catrett*, 106 S. Ct. 2548, 2553 (1986) (requiring the moving party to set forth "the basis for its motion, and identify[] those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate an absence of a genuine issue of material fact"); *Lindsay*, 578 F.3d at 414 ("The party moving for summary judgment bears the initial burden of showing that there is no material issue in dispute."). If the moving party meets its burden, the burden then shifts to the nonmoving party to produce "specific facts" showing a "genuine issue" for trial. *Celotex Corp.*, 106. S. Ct. at 2253; *Bass v. Robinson*, 167 F.3d 1041, 1044 (6th Cir. 1999). However, "Rule 56(c)

mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 106 S. Ct. at 2552; *see also id.* at 2557 (Brennan, J., dissenting) ("If the burden of persuasion at trial would be on the *non-moving* party, the party moving for summary judgment may satisfy Rule 56's burden of production in either of two ways. First, the moving party may submit affirmative evidence that negates an essential element of the nonmoving party's claim. Second, the moving party may demonstrate to the Court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim." (emphasis in original)).

A fact is "material" if the underlying substantive law identifies the fact as critical. *Anderson*, 106 S. Ct. at 2510. Thus, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* A "genuine" issue exists if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 2511; *Matsushita Elec. Indus. Co.*, 106 S. Ct. at 1356 ("Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'") (citation omitted). Such evidence must be suitable for admission into evidence at trial. *Salt Lick Bancorp v. FDIC*, 187 F. App'x 428, 444-45 (6th Cir. 2006).

## 2. KCRA Standard

The Kentucky Civil Rights Act (KCRA) provides in pertinent part: "It is an unlawful practice for an employer . . . to discharge any individual . . . because the person is a qualified individual with a disability[.]" KRS § 344.040(1)(a). Because the KCRA largely parallels the Americans with Disabilities Act (ADA), 42 U.S.C. § 12112, *et seq.*, courts traditionally interpret the KCRA with an ear to its federal forebear. *See, e.g.*, *Lafferty v. United Parcel Serv., Inc.*, 186

F. Supp. 3d 702, 707–08 (W.D. Ky. 2016) (citing *Howard Baer, Inc. v. Schave,* 127 S.W.3d 589, 592 (Ky. 2003); *Bryson v. Regis Corp.*, 498 F.3d 561, 574 (6th Cir. 2007); *Banks v. Bosch Rexroth Corp.*, 610 F. App'x 519, 526 (6th Cir. 2015)) ("Because the language of the KCRA mirrors (for the most part) that of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.*, courts interpret the KCRA consistent with the ADA."); *see also Webb v. Humana*, 819 F. Supp. 2d 641, 644–45 (W.D. Ky. 2011) ("The language of the KCRA mirrors that of federal anti-discrimination law, and courts have interpreted the Kentucky Act consistently therewith."); *accord Brohm v. JH Properties, Inc.*, 149 F.3d 517, 520 (6th Cir. 1998).

This interpretive view is not an absolute. Despite the ADA's reformation in 2008 with the passage of the ADA Amendments Act (ADAAA),[13] most courts continue to apply pre-2008 ADA jurisprudence to KCRA analysis. *See Krueger v. Home Depot USA, Inc.*, 674 F. App'x 490, 494 (6th Cir. 2017) ("[T]he Kentucky legislature adopted the language in the KCRA in 1992 and intended it to reflect the language of the ADA at that time, not the subsequent amendments."); *Breen v. Infiltrator Systems*, 417 F. App'x 483, 486 (6th Cir. 2011) ("[T]h[e] amendment has yet to be incorporated into the Kentucky statute, *see* K.R.S. § 344.010(4), so the pre-2008 ADA standards apply to [Plaintiff]'s claim."); *Sanders v. Bemis Co., Inc.*, No. 3:16-cv-14-GFVT, 2017 WL 3401277, *1, *5 (E.D. Ky. Aug. 8, 2017) ("[T]he KCRA is interpreted consistent with pre-ADAAA, rather than post-ADAAA, jurisprudence."); *Lafferty*, 186 F. Supp. 3d at 707 n.3 (W.D. Ky. 2016) (noting that "[f]ederal courts continue to interpret the KCRA consistent with pre-ADAAA jurisprudence" and collecting supporting cases); *Larison v. Home of the Innocents*, 551 S.W.3d 36, 43 (Ky. 2018) ("[N]o matter these current definitions, 'the KCRA retains the [ADA's]

---

[13] Pub. L. No. 110–325, 122 Stat 3553 (2008).

former definition of disability[,]' prior to the 2008 Amendments of the federal law.") (quoting *Azzam v. Baptist Healthcare Affiliates, Inc.*, 855 F. Supp. 2d 653, 657 n.2 (W.D. Ky. 2012)).

The *Azzam* court emphasized the imprudence of "assum[ing] that the Kentucky legislature, by drafting language in 1992 that mirrored federal law at the time, *see* 1992 Ky. Acts 282, § 1, intended to incorporate federal legislative alterations that occurred in 2008." 855 F. Supp. 2d at 657 n.2. Despite the authority, Rose urges the Court to apply ADAAA standards to his claim, arguing they are more consistent with the original purpose of the KCRA. *See* DE #34 at 16. However, the small minority of cases that applied the ADAAA to KCRA claims either did so without analysis, or indiscriminately applied ADAAA standards to scenarios involving both ADA and KCRA counts; moreover, these cases still rely heavily on pre-2008 case law.[14] Both the Sixth Circuit, and Kentucky in *Larison*, went the other way; this effectively is controlling authority. Thus, this Court joins the bulk of courts that "continue to apply pre-ADAAA jurisprudence to [the KCRA] . . . '[u]ntil such time as the Kentucky Supreme Court or General Assembly speaks on this issue[.]'" *Sanders*, 2017 WL 3401277 at *5 n.3 (quoting *Lafferty*, 186 F. Supp. 3d at 707 n.3)).

---

[14] *See Tanner v. Jefferson Cty. Bd. of Educ.*, No. 2015-CA-1795-MR, 2017 WL 2332681, *1, *2 (Ky. Ct. App. May 26, 2017) (unpublished) (citing the ADAAA without analysis and relying primarily on pre-2008 case law); *Gesegnet v. J.B. Hunt Transport, Inc.*, No. 3:09-cv-828-JGH, 2011 WL 2119248, *1, *2 (W.D. Ky. May 26, 2011) (applying the ADAAA to both federal and KCRA disability discrimination claims "[b]ecause the events in question took place after the [ADAAA's] effective date" without differentiating between the two claims); *Banks v. Bosch Rexroth Corp.*, 610 F. App'x 519, 526–32 (6th Cir. 2015) (applying the ADAAA to a KCRA discrimination claim without analysis, while relying almost entirely on pre-2008 cases and nevertheless noting that the KCRA's purpose is "[t]o provide for execution within the state of the policies embodies in . . . the Americans with Disabilities Act of 1990" (quoting KRS § 344.020(a)); *Kimbro v. Kentucky*, No. 5:13-cv-215, 2015 WL 3687672, *1, *3–*5 (W.D. Ky. June 12, 2015) (applying the ADAAA indiscriminately to both federal and KCRA disability discrimination claims). Nothing but common lineage and traditional parallelism would warrant treating Kentucky's 1992 enactment as modified by Congress sixteen years later. Those are not enough.

Under the KCRA, "[d]isability discrimination claimants can proceed under the separate legal theories of disparate treatment and failure to accommodate." *Webb v. Humana Inc.*, 819 F. Supp. 2d 641, 645 (W.D. Ky. 2011). Rose chose the former route.[15] *See* DE #17-1 ¶¶ 22–25 (Complaint) (alleging "UPS's unlawful firing of Plaintiff James Rose for his disability"). Because Rose does not present direct evidence of disparate treatment,[16] he must establish the following prima facie elements under Kentucky law: (1) he had a disabililty under the KCRA; (2) he was otherwise qualified for the position, with or without reasonable accommodation; and (3) he suffered an adverse employment action because of his disability. *See Bogart v. Univ. of Kentucky*, No. 18-5029, 2019 WL 1254690, at *6 (6th Cir. Mar. 18, 2019) (citing *Murray v. E. Ky. Univ.*, 328 S.W.3d 679, 682 (Ky. Ct. App. 2009)); *see also Hedrick v. Western Reserve Care System*, 355 F.3d 444, 453 (6th Cir. 2004) (citing *Monette v. Electronic Data Sys. Corp.*, 90 F.3d 1173, 1186–87 (6th Cir. 1996)); *Whitfield v. Tennessee*, 639 F.3d 253, 258–59 (6th Cir. 2011). To establish the third element, Rose must show that his disability was the but-for cause of termination. *See Bogart*, 2019 WL 1254690, at *6 (citing *Lewis v. Humboldt Acquisition Corp., Inc.*, 681 F.3d 312, 321 (6th Cir. 2012) (en banc)). Kentucky requires the same showing. *See id.* (citing *Hammond v.*

---

[15] Rose devotes a portion of his response memorandum to arguing facts that bear on a failure-to-accommodate claim, rather than a disparate treatment claim. *See* DE #34 at 6–8 (discussing breakdowns of the interactive process). However, Rose does not allege and did not plead such a claim, and, indeed, one would not be successful here. Despite Rose's contention in his response that he should have been offered the accommodation of editing his time card, he did not suggest this to Mattingly prior to termination. *See* DE #34-1 at ¶ 3. As one of the prima facie elements of a failure-to-accommodate claim, the employee must show that he affirmatively requested an accommodation. *See, e.g.*, *Larison*, 551 S.W.3d at 45.

[16] "Direct evidence of an unlawful employment practice is evidence that directly reflects the alleged animus and that bears squarely on the contested employment decision." *Hallahan v. The Courier-Journal*, 138 S.W.3d 699, 710 (Ky. 2004). It "requires no inference or presumption to prove the existence of a fact." *Chandler v. Specialty Tires of Am. (Tenn.), Inc.*, 134 F. App'x 921, 927 (6th Cir. 2005). Rose's allegations require the factfinder to infer a connection between his claimed disability and termination based on the surrounding circumstances. Rose does not argue this as a direct evidence case.

*Norton Healthcare, Inc.*, No. 2011-CA-000586-MR, 2012 WL 5039465, at \*6 (Ky. Ct. App. Oct. 19, 2012)). Part of the but-for showing logically involves proper notice to the employer.

Per the *McDonnell Douglas*[17] burden-shifting framework applicable to indirect evidence claims, if Rose succeeds in establishing his prima facie case, UPS must then provide a legitimate, nondiscriminatory explanation for its adverse action; if UPS does so, the burden shifts back to Rose to demonstrate that UPS's proffered explanation is mere pretext for actual discrimination. *Whitfield*, 639 F.3d at 259; *Hammond*, 2012 WL 5039465, at \*3 (citing *Hedrick*, 355 F.3d at 552–53). To show that UPS's explanation is pretextual, he must demonstrate that UPS did not "reasonably rel[y] on the particularized facts that were before it at the time the decision was made." *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 599 (6th Cir. 2007) (quoting *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001). The Court will not second-guess legitimate business decisions and does "not require that the decisional process used by the employer be optimal or that it left no stone unturned." *Id.* (quoting *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998)).

The material facts underlying Rose's claim are not genuinely in dispute. Rose's response to UPS's motion contests relatively minor factual issues that may bear on whether UPS made the "right" or "fair" decision when it terminated him, but that are ultimately irrelevant to whether Rose has met his legal burden of establishing disparate treatment based on a disability. Rose has not proven, or pointed to unresolved factual issues bearing on, whether he was disabled for KCRA purposes. Moreover, Rose has not provided sufficient evidence from which a jury could surmise that UPS either knew, or should have known, of any alleged disability—a threshold showing

---

[17] *McDonnell Douglas Corp. v. Green*, 93 S. Ct. 1817 (1973). Kentucky follows this. *See Larison*, 551 S.W.3d 36, 41 (Ky. Ct. App. 2018) (quoting *Williams v. Wal-Mart Stores, Inc.*, 184 S.W.3d 492, 496–96 (Ky 2005)).

necessary to establish that UPS discriminated against him *because of* his disability. Since Rose fails to make these showings, his claim fails at the prima facie stage. Additionally, and as an alternative basis for dismissal, Rose has not shown that UPS's proffered nondiscriminatory reasons for termination—timecard dishonesty and failure to comply with UPS activity reporting policies—are pretextual.

### 3. Rose Is Not Disabled Under the KCRA

The KCRA and ADA define "disability" as: (1) having a physical or mental impairment that substantially limits one or more of an individual's major life activities; (2) having a record of such an impairment; or (3) being regarded as having such an impairment. KRS § 344.010(4); *Hedrick*, 355 F.3d at 452 n.5 (citing *Toyota Motor Mfg., Kentucky, Inc. v. Williams*, 122 S. Ct. 681, 689 (2002), *superseded by statute*, Pub. L. No. 110–325, 122 Stat 3553 (ADAAA) (2009)). Rose asserts that he has an impairment that actually "substantially limits" one or more "major life activities." *Bryson v. Regis Corp.*, 498 F.3d 561, 575 (6th Cir. 2007) (citing *Toyota*, 122 S. Ct. at 691); *see* DE #34 at 17, 19. "Merely having an impairment does not make one disabled for purposes of the ADA." *Toyota*, 122 S. Ct. at 690. "An impairment that only moderately or intermittently prevents an individual from performing major life activities is not a substantial limitation under the ADA." *Laws v. HealthSouth N. Ky. Rehabilitation Hosp. Ltd. Partnership*, 828 F. Supp. 2d 989, 913 (E.D. Ky. 2011) (quoting *Bryson*, 498 F.3d at 576 (internal quotation marks and citation omitted)). A qualifying major life activity must be one that is "of central importance to daily life." *Toyota*, 122 S. Ct. at 691. Evaluating the degree of limitation and

centrality of the life activity at issue "should be considered in tandem with respect to the particular individual claimant[.]"[18] *Hallahan*, 138 S.W.3d at 708.

Rose's putative impairment is an enlarged prostate,[19] which he asserts generally "affects [his] ability to use [his] bladder" (DE #34-1, Rose Aff., at ¶ 14) and requires "frequent use of the restroom" (DE #41-1, Rose Depo., at 48).[20] Rose identifies in his deposition several major life activities he claims the condition affects, including sleeping, eating, and sexual activity.[21] DE #41-

---

[18] Rose argues that the Court should not consider mitigating measures in evaluating the degree of limitation in any major life activity. However, under pre-ADAAA standards, the Supreme Court foreclosed this argument, concluding that the ameliorative effects of medication, etc., properly impact the analysis:

> A "disability" exists only where an impairment "substantially limits" a major life activity, not where it "might," "could," or "would" be substantially limiting if mitigating measures were not taken . . . To be sure, a person whose physical or mental impairment is corrected by mitigating measures still has an impairment, but if the impairment is corrected it does not "substantially limi[t]" a major life activity.

*Sutton v. United Air Lines, Inc.*, 119 S. Ct. 2139, 2146 (1999), *superseded by statute*, Pub. L. No. 110–325, 122 Stat 3553 (ADAAA) (2009). *Cf.* 42 U.S.C. § 12102(4)(E)(i) (Effective Jan. 1, 2009).

[19] As a general matter, other courts considering the impairment—an enlarged prostate—have declined to find a qualifying disability, even under ADAAA standards. *See Crowell v. Beeler*, No. 114CV01724, 2017 WL 1198579, *1, *8–9 (E.D. Cal. Mar. 31, 2017) ("To the extent that Crowell is relying on an enlarged prostate, the Court is not convinced[,]" even under the ADAAA); *Gibbon v. New York*, No. 07-CIV-6698, 2008 WL 5068966, *1, *2–5 (S.D.N.Y. Nov. 25, 2008) (finding the plaintiff's prostate condition, which he controlled with Flomax, insufficient to qualify as a disability under the ADA). *Cf. Roush v. Weastec, Inc.*, 96 F.3d 840, 844 (6th Cir. 1996) (reversing district court's grant of summary judgment to employer where the plaintiff testified that her bladder condition caused "substantial pain" and required monthly or even semi-monthly doctor visits to control resulting infections, substantially limiting her ability to work). Rose does not provide nearly the detail of the successful *Roush* plaintiff, and his cursory descriptions of symptoms more closely resemble the plaintiff's showings in *Crowell* and *Gibbon*. And, notably, Rose omits from his response any citation to case law suggesting that such a prostate condition would qualify as an ADA or KCRA disability. *See* DE #34 at 18.

[20] Rose's enlarged prostate, as a condition that affects his genitourinary functions, qualifies as a physical impairment for ADA purposes. *See Toyota*, 122 S. Ct. at 690.

[21] The Court accepts that these are major life activities, and UPS has not argued otherwise. *See, e.g.*, *Pack v. Kmart Corp.*, 166 F.3d 1300, 1305 (10th Cir. 1999) (holding that sleeping is a major life activity under the ADA); *Fraser v. Goodale*, 342 F.3d 1032, 1040 (10th Cir. 2003) (holding

1 at 61; DE #34-1 at ¶ 14. Rose additionally argues, in his response memorandum (DE #34), that his physical impairment affects the major life activity of working.[22] For each identified major life activity, ADA claimants must "prove a disability by offering evidence that the extent of the limitation [caused by the impairment] in terms of their own experience . . . is substantial." *Toyota*, 122 S. Ct. at 691–92 (quoting *Albertson's, Inc. v. Kirkingburg*, 119 S. Ct. 2162, 2169 (1999)). The ADA (pre-2008) and KCRA consider "substantially limited" to mean:

> (i) unable to perform a major life activity that the average person in the general population can perform; or (ii) significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform the same major life activity.

*Hallahan*, 138 S.W.3d at 708 (quoting pre-ADAAA 29 C.F.R. § 1630.2(j)(1)). The Court considers the nature and severity of the impairment, its expected duration, and whether it has a permanent or long-term impact. *Toyota*, 122 S. Ct. at 690.

Even accepting as true Rose's testimony that his prostate condition first emerged in April or May of 2016, prior to the termination on June 27—despite the plainly inconsistent medical evidence on this point[23]—Rose's allegations as to the effects of the condition are simply too

---

that, broadly speaking, eating is a major life activity under the ADA); *Bragdon v. Abbott*, 118 S. Ct. 2196, 2205 (1998) (holding that reproduction is a major life activity under the ADA).

[22] *See Sutton*, 119 S. Ct. at 2151 (considering working a major life activity).

[23] *Compare* DE #24-2 at 66 (Rose stating that his condition began in April or May of 2016) *with* DE #24-14 at 2–3 (Notes from Dr. Birdwhistell and APRN Damron stating that the condition began on June 28, 2016). Rose's claim of April/May 2016 condition onset surely is a stretch. Rose provides no documentation of earlier treatment. Further, he conceded in the deposition that any prior treatment resolved the issue. *See* DE #24-2 at 130–32 (stating he had received "antibiotics and stuff" related to his "problems peeing" and treatment lasted "probably until the symptoms got better or the pills ran out," which took "[a] couple of weeks"). Finally, he claimed on the date of discharge to be unsure of his particular condition, pointing to either a UTI, kidney issues, or a prostate problem. *See id.* at 77–78 ("I told him . . . you know, I discussed it took me that long because I believe that I have either a kidney infection or a urinary tract infection, or it could be my prostate."). If Rose did not understand his particular problem on the day, it is difficult to credit his claim that the prostate condition persisted from April or May 2016.

skeletal to satisfy the prima facie burden under this element. Although Rose argues that he is "significantly restricted" in several major life activities as a result of his enlarged prostate, he provides scant detail as to the effect of these limitations in his own personal experience. *See* DE #41-1 at 61–62 (generally identifying sleeping, eating, and sexual habits as affected life activities); *id.* at 62 ("I have to eat healthier foods, certain types of food. As far as drinking, I have to limit what I drink[.]");[24] *id.* ("I have to get up during the night to use the restroom quite a bit[.]"); *id.* ("I'm not able to perform [sexual activities] like I used to be able to. And that is to say I'm not able to perform at all."); *see also* DE #34-1 ("[The enlarged prostate] interrupts my sleep, making me awaken every two hours . . . it is controlled by Flomax and a good diet, but not cured.").[25] Rose does not argue the sexual limitation in briefing. The other assertions, conclusory statements about Rose's prostate condition—which represent the extent of information Rose provides on the record—do not provide enough information to raise genuine questions as to whether he is "significantly restricted" in eating, sleeping, or bladder function. Rose fails to provide experiential detail from which a juror could reasonably conclude that his personal limitations in these areas are "substantial" in comparison with the average person or general population, as he must under the applicable KCRA standard.

Similarly, Rose does not provide evidence to demonstrate a substantial limitation in the major life activity of working, an argument raised only in briefing. "When the major life activity

---

[24] Simply being required to eat healthier is not a substantial limitation on eating. *See Brady v. Potter,* 273 Fed. Appx. 498, 503 (6th Cir. 2008) ("If the need to watch what one eats constitutes a disability, then almost everyone is disabled.").

[25] At least one court has found frequent urination an insufficiently severe impairment, where the plaintiff was required to use the restroom every hour and a half to two hours. *See McCoy v. Geico General Ins. Co.,* 510 F. Supp. 2d 739, 750 (M.D. Fla. 2007). Rose points to no contra supportive cases.

under consideration is that of working, the statutory phrase 'substantially limits' requires, at a minimum, that plaintiffs allege they are unable to work in a broad class of jobs." *Sutton*, 119 S. Ct. at 2151. Rose asserts that his ability to work is impaired by his lack of bladder control because (1) he must urinate more frequently and (2) it takes him longer to do so. DE #34 at 21. However, Rose admits in his deposition that he no longer requires prolonged bathroom breaks, which is corroborated by the medical evidence he provides. *See* DE #41-1 at 48 ("Then [the doctor's note] goes on to say, 'Patient had medical issues previously, prolonged bathroom time' . . . But then it says 'issue is resolved'; is that correct?" . . . "The frequent use of the restroom is still there, but taking the excessive amounts of time [is resolved], yes."); *accord* DE #24-14 at 3 (referenced doctor's note stating that, although Rose "had [a] medical issue requiring prolonged bathroom time" beginning on June 28, 2016, the "issue [was] resolved" as of July 25, 2016, at the latest). The inconvenience of taking potentially "longer" bathroom breaks, which Rose cannot even definitively say were longer than usual for him,[26] and which affected him at most a few months and is now resolved, cannot be said to have substantially limited his ability to work in his field under the ADA (or KCRA).

Nor does Rose provide any detail as to how frequent urination impaired his ability to work in the field of truck driving. Despite stating that he awakened frequently at night to use the restroom, nowhere in the record does Rose expand on how this interfered with an ability to drive a truck during the day. *See* DE #41-1 at 62; DE #34-1 at ¶ 14. Rose does not state—much less demonstrate via evidence of his personal experiences—that these allegedly persisting frequent (albeit not prolonged) trips to the restroom hindered his performance in "a broad range of jobs in

---

[26] Rose admits that he cannot quantify the time it took him to use the restroom or determine whether it was even abnormally long compared to his usual standard, much less that of the general population. *See* DE #41-1 at 35.

various classes as compared to the average person having comparable training, skills and abilities[.]" *Sutton*, 119 S. Ct. at 2151. To the contrary, Rose admits that he has held two jobs in his identified field of truck driving since termination from UPS. *See* DE #41-1 at 64–66 (Rose stating that he worked for Pepsi Cola, before leaving voluntarily to earn higher pay at FedEx, in his regular trade as a truck driver). Moreover, the medical evidence indicates that Rose suffered no work-related limitations as a result of his prostate condition after July 6, 2016. *See* DE #24-14 at 2 (doctor's note stating that "Patient may return to work 7/6/16 with *no restrictions*.") (emphasis added). Rose even admits that he suffered no medical issues while at UPS that affected his ability to do the job, aside from the concededly temporary issue of taking "longer bathroom breaks." *See* DE #41-1 at 12 (Rose stating, after being asked whether he experienced any medical issues while at UPS that affected his work: "[N]ot that I know of that affected me to do my job. I had the prostate problem that came up that caused me to, you know, take longer bathroom breaks."). Given the utter lack of information Rose provides about his condition's impact on work while at UPS, coupled with his post-UPS experience successfully working in the same field, there is simply no genuine question as to whether the prostate condition was severe enough to impose a substantial limitation on Rose's ability to work as a truck driver. The facts undergirding Rose's claim of disability are not in dispute, and, taken as true with all reasonable inferences being drawn in Rose's favor, they are insufficient to establish the first element of his prima facie case.

On balance, Rose summarily alleges the existence of a disability and offers only vague descriptions of the effects he suffers; despite phrasing it in various ways, Rose gives little information about his impairment beyond the fact that it transiently made urinating more difficult. *See* DE #41-1 at 13 (Rose telling a fellow driver that he had "been having problems using the restroom and stuff"); *id.* at 15 (Rose telling a driver supervisor that he had "been pissing all day");

*id.* at 33 ("[I]t took me longer to use the restroom all that day."); *id.* at 35 ("I had problems using the restroom all day[.]"); *id.* at 49 ("I had problems peeing . . . I mean, that's how I'd put it."). And, the medical evidence Rose provides is of little assistance in fleshing out the details. *See* DE #24-14 at 1 (Doctor Angel Justice noting that, while out to dinner with Rose and other friends on June 25, 2016, "he complained of left back pain, frequent urination, urinating hesitantly, and some dribbling[,]" and that she suggested he visit his family physician in response); *id.* at 2 (APRN Damron merely noting, apparently on July 6, 2016, that Rose could return to work without restrictions as of that same date); *id.* at 3 (Rose's family physician, Doctor Birdwhistell, noting that Rose's issue, beginning on June 28, 2016 and "requiring prolonged bathroom time is now resolved[,]" as of July 25, 2016, at latest). Beyond his ongoing use of Flomax to "control" his impairment, Rose cannot even recall precisely the treatment he received and utilized to ameliorate the issue during the period leading up to and including termination from UPS. DE #34-1 at ¶ 14; *see* DE #24-1 at 132 (Rose testifying to lack of recollection regarding what medicine he allegedly took to control his prostate issue beginning in May 2016, where he received it, or for how long he took it). There are no supportive records as to that period. The most Rose describes is a condition that, at times, caused and causes him to use the restroom more often and have some difficulty doing so. He does not explain how the enlarged prostate affects defined major life activities in any particularized and significant way, nor does he provide detail as to the extent of his limitations post-treatment, merely stating that his enlarged prostate "affects his ability to use his bladder, and is controlled by Flomax and a good diet, but not cured." DE #34-1 at ¶ 14. Collectively, these facts are inadequate to meet Rose's burden under the KCRA's actual disability prong.

A short-term or temporary impairment does not qualify as a KCRA disability. *See Larison,* 551 S.W.3d at 43 ("Under the former definition, courts generally ascribe to a strict interpretation

of temporariness, thereby making most, if not all, temporary impairments insufficient impairments as a matter of law. *See Spence v. Donahoe*, 515 F. App'x 561, 569 (6th Cir. 2013). 'Lack of a permanent or long-term impairment is generally fatal to a claim of disability.' *Id.").* A non-severe impairment also fails to cross the protected bar. *See Hallahan*, 138 S.W.3d at 711 (quoting *Toyota*, 122 S. Ct. at 691) ("[T]o be substantially limiting, an impairment must do more than interfere with the activity in a minor way or for a temporary period. '[A]n individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives.'"). Rose did not even know what problem he had on the firing date, a condition he claimed hit him like "a sledgehammer." However weighty the blow, his providers called the matter concluded, "resolved," by either July 7, 2016 or July 25, 2016. Such a short-term, episodic experience is not a KCRA disability. Long-term, Rose has dealt with a medically managed, in Rose's word "controlled," lifestyle complication that simply lacks the severity required under the KCRA language. He had no protected disability at the time of discharge by UPS.

### 4. UPS Did Not Terminate Rose Because of His Alleged Disability

Rose makes a similarly weak showing as to the third prima facie element, that UPS terminated Rose because of his alleged disability. It is axiomatic that "an 'employer must know about a disability before it can intentionally discriminate against an employee based on that disability. Otherwise, it could not be said that the employer discriminated "because of" the disability.'" *Tanner*, 2017 WL 2332681, at *3 (quoting *Kocsis v. Multi–Care Management, Inc.*, 97 F.3d 876, 881 (6th Cir. 1996)); *see also Nilles v. Givaudan Flavors Corp.*, 521 F. App'x 364, 368 (6th Cir. 2013) (collecting cases). Rose essentially concedes that UPS did not *actually* know that he had an impairment possibly qualifying as a disability; he admits he does not believe that

UPS terminated him on that basis. When asked what he thought was the reason for termination, Rose responded: "I believe he said I was dishonest. . . Mr. Mattingly, I would assume, thought I wasn't sick, that I was making it up. And that's why he did not believe me. He thought I was making it up, I was stealing time, and that's what he thought." DE #24-2 (Rose Depo.) at 121. When asked how he believed the termination related to his perceived disability, Rose further testified: "Because I believe that they did not believe I have a medical disability. I believe that he thought I was stealing time, intentionally stealing time." *Id.* at 146. Rose attempts to clarify these statements via the affidavit attached to his response memorandum, but the "clarification" does not alter the statements' substantive meaning—that Rose supposed Mattingly did not really believe he had an impairment: "My statement about what [Mattingly] 'thought' is simply confirmation that he may have thought my medical condition amounted to stealing time." DE #34-1 at ¶ 11.

    In addition to Rose's own understanding of the situation, Mattingly testified that, in the termination meeting, he felt Rose was not being forthright or honest in responding to his questions: "[T]he conversation was that his time card had over two hours of unaccounted for time . . . Mr. Rose could not account for what he was doing for the extra two hours that he took to run that run that day." DE #37 (Mattingly Depo.) at 56. Although Mattingly concedes that Rose stated he was (at times) in the restroom, he asserts that Rose's lack of detail and explanation caused him to generally question Rose's veracity as to the day's events. *Id.* at 57 ("When he was asked how many times did he stop—'I don't know.' 'Where did you stop?' 'I'm not sure.' He was very vague and evasive in his answering. 'What did you do?' 'I used the restroom.' 'What else?' 'I don't know.' 'Why did it take you so long at the turn-around location?' 'I don't know.'"). Rose himself did not track and could not detail his bathroom stops. *See, e.g.*, DE #24-2 (Rose Depo.) at 112 ("Yeah. I mean, I don't know if it took me—I don't know how long it took me. Like I said, I did not track

the time.); *id.* at 68 ("'Okay. And so about how long did it take you to use the bathroom that day?' 'I don't—I don't know, ma'am. I just know that it just took me a while.'"); *see also* DE #26 (audio CD of panel hearing) at 0:16:22–0:16:45 (union president, and Rose agent, Michael Philbeck stating that Rose "totally lost track of time" once in Beckley). The discipline form accompanying the dismissal letter offers an explanation for Rose's termination consistent with both Rose's and Mattingly's impression of the June 27 conversation's purpose: "Employee James Rose took multiple unrecorded stops (4) on his way to Beckley WV and on his way back from Beckley WV extending his paid day . . . Could not properly account for the 77 minutes of [turnaround] time." DE #30-11 at 5. Together, this evidence demonstrates that Mattingly did not have (much less base Rose's termination upon) actual knowledge of Rose's medical issues.

As to whether UPS *should have* known of Rose's medical issues, there are five relevant incidents in the record—which, collectively, fail to suggest that UPS should have had notice of any qualifying impairment:

- In May 2016, Rose did a local run to Sharonville. At the Sharonville hub, he felt the urge to use the restroom, but the only one he could locate had a "closed" sign on the door; however, after seeing two other UPS workers enter and use that restroom, Rose decided to do so as well. The other employees finished in the restroom prior to Rose, and by the time Rose exited, a maintenance woman had appeared and began scolding him rather harshly for using a "closed" restroom. DE #24-2 at 66–68 ("So I come out and there she is like kind of ranting, you know, 'can't you read,' and all of this . . . I said, 'Ma'am, I just had to use the restroom.' And this kept going on and on and just made a big scene of it."). When Rose returned to the Lexington hub, he told dispatch supervisor Tim Keech that he had

felt "belittled" in Sharonville, and Keech ultimately spoke to Mattingly. *Id.* at 69–71. A couple of days later, Mattingly approached Rose and apologized for the woman's behavior, and Rose expressed that he had felt "isolated out because it took [him] longer to use the restroom than anybody else[,]" but he did not mention anything related to his prostate condition or any other medical concerns. *Id.* at 71.

- On the morning of June 27, Rose spoke with fellow driver (and union steward) Gary Kendrick and said that he was experiencing sinus issues and had "been having problems using the restroom and stuff." *Id.* at 72–73. Kendrick responded that Rose "better get it checked out . . . It could be something with your prostate."

- At the Beckley turnaround on June 27, Rose briefly spoke to Robert Williams, a driver supervisor, about his issue: "I said, 'Robert, I don't know what's going on.' I said, 'I've been pissing all day.'"). *Id.* at 74. The conversation then pivoted.

- During the termination meeting with Mattingly, Rose speculated that his bathroom stops might be attributable to a number of ailments, and suggested he may need to see a doctor about it: "I discussed it took me that long because I believe that I have either a kidney infection or a urinary tract infection, or it could be my prostate." *Id.* at 77–78.

- Rose argues in his response brief that, during the termination meeting, and due to dehydration from frequent urination, his "mental condition was severely impaired, which was apparent to [Gil Daniel], and should have been evidence to Mattingly." DE #34 at 7. However, the evidence to which Rose cites for this proposition is an unsworn statement, inappropriate for the Court's consideration, as previously discussed in this opinion. *See* DE #30-15 (Exhibit 25 to Mattingly Depo.).

These incidents, taken together, do not provide adequate evidence to demonstrate that UPS should have known of Rose's claimed prostate issue. "The employer is not required to speculate as to the extent of the employee's disability or the employee's need or desire for an accommodation." *Hammon v. DHL Airways, Inc.*, 165 F.3d 441, 450 (6th Cir. 1999) (quoting *Gantt v. Wilson Sporting Goods Co.*, 143 F.3d 1042, 1046–47 (6th Cir. 1998)). And "[v]ague or conclusory statements revealing an unspecified incapacity are not sufficient to put an employer on notice of its obligations under the ADA." *Tanner*, 2017 WL 2332681, at *3 (citation omitted). Where Rose himself did not even know the reason for or origin of his difficulty urinating, and merely speculated that it "could have" been a number of issues, it is entirely unreasonable to expect UPS management to have recognized that something of legal significance was amiss medically. There mere temporal proximity of this speculation and UPS's decision to terminate Rose, without more, is insufficient to raise a genuine question as to whether UPS knew or had reason to know of a disabling prostate condition.

The interaction with the steward, not a UPS agent, is irrelevant. The stray remark at the turnaround included no medical indication. The alleged third-party observation at the termination meeting is hearsay and lacks substantiation. This leaves only the interaction with Mattingly, and Rose there directly showed that he himself did understand the root of the alleged issue, relaying only a series of alternative possible causes. The Court again notes Rose's initial litigation approach on this. His union representative[27] at the panel hearing, Philbeck, directly conceded that Rose failed to inform the company of any medical issues. The representative acknowledged Rose's mistakes, the fact that he lost track of time, and the fact that Rose did not inform UPS of his problems. *See* DE #26 at 0:16:22–0:16:45 ("[Rose] totally lost track of time . . . Mr. Rose ma[de] his first mistake

---

[27] This Federal Rule of Evidence 801(d)(2) material definitionally is "not hearsay."

and should have notified Dispatch of his health issues."); *id.* at 0:18:15–0:18:19 ("Mr. Rose has admitted that he failed to notify the Company of his illness and/or his abnormally long stops[.]"). A company can only act on the information it has, and Plaintiff has failed to present a triable issue on UPS's awareness of any disability at the time of termination.

The Court finds that UPS, through Mattingly, could not have known "enough information about the employee's condition to conclude that he is disabled." *Cady v. Remington Arms Co.*, 665 F. App'x 413, 417 (6th Cir. 2016). Rose had not alerted the company to any medical problem during the route. His first response under Mattingly's questioning indicated no concerns during the haul. Only when accused did Rose reference any physical excuse, and at that point, Rose could only parrot the speculation his physician-friend had given over dinner the night before. It ended up that Rose had an acute, promptly resolved problem. He did not know of a disability at the time of termination because, legally, there was none. UPS could not have perceived any more than Rose himself knew, and the claim fails at the knowledge junction. Accordingly, UPS could not have terminated Rose "because of" (under the KCRA's but-for standard) a claimed disability that UPS did not know, and had no reason to know, existed. *See Tanner*, 2017 WL 2332681, at *3 (quoting *Kocsis*, 97 F.3d at 881)).

### 5. Rose Failed to Show Pretext

Even if Rose could establish a prima facie case of disability discrimination under the KCRA, he has failed to demonstrate that UPS's stated reason for termination[28] was pretextual.

---

[28] Mattingly testified: "[T]he conversation [preceding Rose's termination] was that his time card had over two hours of unaccounted for time." DE #37 at 56. "I interviewed Mr. Rose. He could not account for his time, he was deceptive in his answers, he was dishonest about his activities that day. I relayed that information to Mr. Faulstick, he was discharged." *Id.* at 129. Faulstick largely corroborates this: "I reviewed the information that was provided to me from the company [verbally by Mattingly] and I made the decision." DE #40 (Faulstick Depo.) at 22–23. "The initial

Rose has the "burden of providing specific evidence from which a reasonable jury could conclude that [UPS's] nondiscriminatory reason for firing him was a pretext for discrimination." *Bogart*, 2019 WL 1254690, at *8 (citing *Johnson v. Kroger Co.*, 319 F.3d 858, 866 (6th Cir. 2003)); *accord Warfield v. Lebanon Correctional Inst.*, 181 F.3d 723, 730 (6th Cir. 1999). A plaintiff may show that an employer's proffered reasons are pretextual "by demonstrating that they (1) 'had no basis in fact,' (2) 'did not actually motivate the employer's action,' or (3) were 'insufficient to motivate the employer's action.'" *Banks*, 610 F. App'x at 532 (6th Cir. 2015) (quoting *Chen v. Dow Chem. Co.,* 580 F.3d 394, 400 (6th Cir. 2009)).

Mattingly had a particularized and factual reason behind the discharge, and UPS substantiated this reason through competent evidence. Indeed, the chronology shows that Mattingly had developed significant concern about the timing that day. *See* DE #37 (Mattingly Depo.) at 37–38 ("I was in my office. There was a conversation in the on-road supervisor office about has anyone heard from James Rose, does anyone know where he's at, know what's going on with him, he's almost at 14 hours and no one has heard from him. And I said [to payroll supervisor Chris Allen], well, call him, see where he's at."); *see* DE #24-2 (Rose Depo.) at 38 ("What [Allen] asked was—or the statement he made was, Jimmy, you're getting ready to violate your 14 hours— or you're getting close to your 14 hours."); DE #24-23 (Mattingly Aff.) at ¶¶ 18–19 ("[H]e had taken nearly 14 hours to complete what should be a 10- or 11-hour run—with nearly 12 of those hours on the clock, in pay status—so I was concerned . . . I planned to question Rose about his delay as soon as he returned[.]"). Mattingly immediately confronted Rose once he returned to the UPS hub, secured the contemporaneous timecard, and then directed Rose to a meeting monitored

conversation was that there were multiple gaps in the day in unaccounted-for time, and Mr. Rose did not have an explanation to account for the gaps in the day and account for time." *Id.* at 24.

by a union representative. Rose concedes now (and has conceded throughout) that he had excessive paid time, included on the timecard, for which he should not have claimed on-duty status. *See* DE #26 (audio of panel hearing) at 1:03:44–1:04:05 (Panel: "Why didn't you clock out for any of this time? Could have saved the whole day just by being . . . accurate." Rose: "I understand that sir, I really do, like I said, I made a mistake at that point."); DE #24-2 at 140 (Rose testifying that his answers at the panel hearing were "complete and accurate" to "the best of [his] knowledge"); DE #34-1 (Rose Aff.) at ¶ 3 (admitting his timecard reflect "excess [paid] time"). Rose thus does not (and could not credibly) argue that UPS's proffered explanation lacked a factual basis on the record.

Although Rose makes much of the timing of alleged disability disclosure and termination (and even assuming for the sake of argument that Rose actually disclosed a qualifying disability to Mattingly during that conversation), Rose concedes that temporal proximity alone is insufficient unless "accompanied by some other, independent evidence." *See* DE #34 at 24 (quoting *Ritenour v. Tennessee Dep't of Human Servs.*, 497 F. App'x 521, 533 (6th Cir. 2012)). Rose thus argues that UPS also articulated inconsistent bases for termination and largely relies on the fact that Mattingly later determined, after the grievance process, that Rose in fact violated the fourteen-hour rule. While fourteen-hour rule brinkmanship was a concern of Mattingly's going into the termination conversation (*see* DE #37 at 37–38), Mattingly testified that it was not a reason he terminated Rose (*see id.* at 79–80), and UPS did not cite it specifically as a formal termination basis in its final communication with Rose (*see* DE #24-12, referencing instead "dishonesty"). Indeed, the accompanying discipline request did not rely on any fourteen-hour rule violation, instead merely factoring the excessive trip length into UPS's overall timekeeping censure: "Rose took multiple unrecorded stops . . . extending his paid day. . . Could not properly account for the 77 minutes of

[turnaround] time. Failed to get management approval for extending his [d]ay over 14 hours. He nearly violated DOT 14 hour rule with less than a minute to spare and never notified management to seek an extension[.]" DE #24-11 at 1. Considering the evidence as a whole, UPS's later determination, upon more careful consideration of GPS records, that Rose actually violated the DOT rule is not evidence of any inconsistency; rather, it fits within the general reasoning of UPS throughout—from the initial termination meeting, through the grievance process, and in this case—that Rose took an inexplicably long time to complete his workday, did not accurately record breaks, could not detail his break times when asked, and failed to communicate with UPS during his shift as to any explanatory difficulties or delays he might have been experiencing.[29]

Despite Rose's attempt to muddy issues on the timing, sequence, and identity of decisionmaker, he nowhere offers evidence indicating that UPS's explanation of timecard dishonesty did not actually motivate the termination decision, or showing that there was an underlying discriminatory animus. Rather, Rose admits that he believes Mattingly honestly thought Rose was "stealing time." *See* DE #24-2 at 121 ("He thought I was making it up, I was stealing time, and that's what he thought.); *id.* at ("I believe that he thought I was stealing time, intentionally stealing time."). And, ultimately, "as long as the employer honestly believed in the proffered reason given for its employment action, the employee cannot establish pretext even if the employer's reason is ultimately found to be mistaken, foolish, trivial, or baseless." *Smith v.*

---

[29] Rose also briefly argues that other non-disabled UPS employees were permitted to edit their timecards to remove excess break time, while Rose was not: "[Rose] was not given the chance to adjust his time consistent with the company's practice, because of his disability." DE #34 at 27–28. This rank speculation raises no genuine factual issue. Rose did not ask to edit his timecard, and, moreover, based on his own admission (both to Mattingly during the termination conversation and in his testimony here) that he had not been tracking his time and could not recall the timing or lengths of his restroom breaks, it is unclear how Rose could have corrected his timecard to accurately reflect his day. Rose had the opportunity to explain his day, correct any paid time discrepancies, and seek accommodation if warranted, and he did not pursue correction.

*Chrysler Corp.*, 155 F.3d 799, 806 (6th Cir. 1998); *see also Banks*, 610 F. App'x at 533. Even if Rose were disabled and UPS somehow knew, Defendant's substantiated discharge basis insulates UPS from liability here. UPS simply acted on what it reasonably, accurately perceived to be true— that Rose had claimed compensation for purely personal time, in violation of UPS rules for timekeeping honesty. *See Bogart*, 2019 WL 1254690, at *6 (noting "eclipse" in causal connection where employer formed discipline basis before disclosure to the employer of disability).

## C. Conclusion

For the stated reasons, the Court **GRANTS** DE # 24 and will issue a separate Judgment. This the 26th day of March, 2019.

Signed By:

*Robert E. Wier*

**United States District Judge**